Muse v. Lexington.

E. E. MUSE *et al.* *v.* TOWN OF LEXINGTON *et al.*

(*Jackson.* April Term, 1903.)

1. **MUNICIPAL CORPORATIONS.** Invalid charter validated by legislative recognition, as well as by direct legislation.

The implied legislative recognition of a municipal charter fatally defective and invalid on account of omissions. and failure to comply with the statutory requirements in the general law providing for incorporation of municipal corporations, is as effectual to validate the charter as any direct legislation expressly validating the same could be. (*Post, pp.* 659-668, and especially 665-668.)

Statutes cited and construed: Acts 1893, chs. 163, 111, 139; Acts 1901, ch. 402.

Cases cited and approved: Woodbury v. Brown, 101 Tenn., 707; Commanche County v. Lewis, 133 U. S., 198; Commissioners v. Rose, 140 U. S., 71; Jameson v. People, 16 Ill., 257; People v. Farnham, 35 Ill., 562; Allen v. Archer, 49 Me., 346; Swain v. Comstock, 18 Wis., 465; Bow v. Allenstown, 34 N. H., 351; Bessey v. Unity Plantations, 65 Me., 347; City of Atchison v. Butcher, 3 Kan., 104.

Cases cited and distinguished: Ruohs v. Athens, 91 Tenn., 20; Norton v. Shelby County, 118 U. S., 425.

2. **LEGISLATURE.** May validate acts that it can authorize in advance.

It is beyond doubt within the power of the legislature to give force and effect to an act invalid for irregularities, where it has power to authorize in advance such act to be done. (*Post, p.* 665.)

Cases cited and approved: Shields v. Land Company, 94 Tenn., 123; Butler v. Association, 97 Tenn., 679.

**3. SAME.** May create a municipal corporation by special act.

It is now settled law in this State that there is no check upon the power of the legislature to create a municipal corporation by a special act. (*Post, p.* 665.)

Case cited and approved: State v. Wilson, 12 Lea, 255.

**4. MUNICIPAL CORPORATIONS.** Bonds of, issued after charter is validated are binding; new corporation liable for debts of old, when.

Bonds issued by municipal corporation after its defective and invalid charter has been validated by legislative recognition thereof, are legal and binding on the corporation; and where the charter has been repealed and another granted by the legislature declaring that all legal claims existing against said old corporation shall be assumed and paid by the new corporation, such obligations are binding upon the new corporation. (*Post pp.* 664-668.)

**5. TAXPAYERS' BILL. CHANCERY PRACTICE.** Taxpayers of a town may maintain bill to declare its bonds void and to enjoin their payment.

A bill is maintainable by the resident taxpayers of a town to have bonds issued in the name of the town declared void for illegality in their issuance, and to enjoin the further collection of taxes to pay interest on them. This seems to have been conceded without question in this case. (*Post, p.* 657.)

## FROM HENDERSON.

Appeal from the Chancery Court of Henderson County.—A. G. HAWKINS, Chancellor.

Muse v. Lexington.

BARHAM & DAVIS and W. C. CALDWELL, for Muse *et als.*

TAYLOR & TAYLOR, and T. K. SKINKER, for Town of Lexington *et als.*

---

MR. CHIEF JUSTICE BEARD delivered the opinion of the opinion of the Court.

The bill in this case was filed by resident taxpayers of the town of Lexington, Tenn., to have certain bonds which were issued in the name of that town declared void for illegality in their issuance and to enjoin the further collection of taxes to pay interest on them.

Among the defendants are the town of Lexington and the St. Louis Trust Company, a corporation chartered under the laws of the State of Missouri, as well as other owners and holders of these bonds.

In the year 1889 certain persons living in the town of Lexington undertook to incorporate the territory embracing it into a municipality under the general laws of the State providing for such incorporation.

The complainants aver that in this effort there was failure in important particulars to comply with the statutory requirements, and they insist that the effect of such failure was to vitiate the charter then obtained, as well as the bonds subsequently issued, some of which are held by certain of the defendants.

110 Tenn—42

In due time answers were filed by such of the defendants as are holders of some of these bonds, in which it was denied that any omissions had been made affecting the due incorporation of the town.

It was also insisted in these answers that the defendants in question were innocent holders, for value, of the bonds in question, and it was submitted to the court whether, in good conscience, they should be made to lose the money which they had invested in these securities by reason of any defect in obtaining the original charter.

It was also urged as a conclusive defense to the bill that the legislature had recognized the existence of Lexington as a municipal corporation by enacting laws relating thereto at the instance of citizens of the town and that by this legislation the corporation had been validated, even if there were original defects in its incorporation.

Upon the issues of fact made evidence was taken, from which it clearly appears that under the authority of the charter obtained in 1889, and immediately thereafter, an election was held, at which a mayor and board of aldermen were chosen for the town, who served until their successors were elected and qualified.

Thereafter, from year to year, similar elections were held, and persons were chosen, who successively served as the officers of the town.

During this period the town authorities passed resolutions or ordinances, levied and collected taxes, and generally performed all the functions of municipal gov-

ernment.   This continued until the month of May, 1901, when the legislature passed an act in words repealing the charter obtained in 1889, and at the same time granted a new charter in lieu thereof, covering this same territory.

It may be remarked in passing that in the month of July, 1895, the courthouse at Lexington, with nearly all of its contents, was destroyed by fire. Among these were the charter and the record thereof, and it is evident that this controversy results from this destruction.   In the absence of the records themselves, complainants have been compelled to rely alone upon the testimony of witnesses who were concerned in obtaining the original charter, given many years after the facts about which they undertook to testify.

An examination of this testimony leaves it extremely doubtful whether they have successfully made out their case as to the various omissions which they charge as fatal to the act of incorporation.

Granting, however, they have done so, and in this respect have brought their case within the authority of *Woodbury* v. *Brown,* 101 Tenn., 707, 50 S. W., 743, the question arises will a legislative recognition of this charter in spite of these omissions give it legal existence? Before calling attention to the acts of the legislature which it is claimed have this effect, and considering the argument of the counsel for the defendants based upon these acts, it is not improper to give a brief statement

of the facts leading up to and connected with the issuance of the bonds in controversy.

In the year 1892, the Paducah, Tennessee & Alabama Railroad had its southern terminus at Hollow Rock, in the county of Carroll, Tenn., distant about 30 miles from the town of Lexington. A large majority of the inhabitants of the latter place desired an extension of this road to their town. In order to induce the company owning this road to extend its line, certain of the public-spirited citizens of Lexington subscribed for $15,000 of the capital stock of the company, to be paid in installments, one-half on the 1st of August, 1892, and the other half on the 2d day of January, 1893.

This failing, however, to be a sufficient inducement, these or other citizens about the same time executed a bond to the company, to be void on the condition that they should have legally issued $5,000 of coupon bonds of the town of Lexington in payment of a like amount of the capital stock of said company.

Upon receipt of these obligations the railroad company went to work, and, by the 1st of January, 1893, had extended its line so as to bring it within the corporate limits of the town.

At the session of the legislature held in the year 1893, the citizens of Lexington obtained the passage of an act (Acts 1893, p. 321, c. 163) in the preamble of which is recited the fact that these two obligations had been executed and delivered to the Paducah, Tennessee & Alabama Railroad, and that in consideration thereof this

line had been extended, resulting in great material advantage to the town, and enacting in its first section "that the mayor and aldermen of the town of Lexington a municipal corporation in the State of Tennessee, are hereby authorized and empowered to subscribe or purchase in their corporate capacity, for and in the name of said town of Lexington, and receive from said Paducah, Tennessee and Alabama Railroad Company, five thousand dollars of its capital stock and purchase the fifteen thousand dollars of the capital stock of said railroad company mentioned and spoken of in the preamble of this act, subscribed for and owned by individuals, most of whom are citizens and taxpayers of said corporate town of Lexington, Henderson county, Tennessee, by complying with the provisions of this act."

By the second section of this act, the authorities of the town were vested with power to make, execute, and deliver to the railroad company its coupon bonds for the $5,000 of capital stock so subscribed for and purchased, and in the third section they were given authority to purchase and receive "in the name of and for the said corporation, to wit, town of Lexington, the fifteen thousand dollars of stock in said railroad company from the individuals who had subscribed for, and were owners of the same," and they were empowered "in their corporate capacity in the name of said town of Lexington to make, execute and sell its coupon bonds," the proceeds of which were to pay the purchase price of the stock of the railroad held or subscribed for by these individuals.

By the fourth section it was provided "that said stock herein mentioned and designated shall not be subscribed for or bought nor the bonds herein provided for shall be issued until an election is held in the said town of Lexington to determine whether the legal voters of said town favor the subscription for and the purchase of said stock and the issuance of said bonds."

The record discloses the fact that the election contemplated in this last section was held, at which an overwhelming majority of the citizens of the town expressed their wish in a legal form that the authorities of the town should subscribe for the $5,000 of stock, and issue the coupon bonds of the town, as contemplated in the second section of the act; and that they should also issue the bonds of the town, and from the proceeds realized from their sale purchase the $15,000 of capital stock in the railroad company referred to in the third section.

After this was done, the bonds of the town were issued and used for the acquisition of $20,000 of the capital stock of this road. The bonds in controversy are some of those issued for this purpose and upon the authority of this act.

Not content, however, with this, at the same session of the legislature the citizens of the town procured the passage of an act which in terms ratified and confirmed an order entered in the county court of Henderson county at a special session of the court held on the 9th day of June, 1892, by which it was directed that all of the taxes assessed and collected (Acts 1893, p. 231, c. 111) on the

property, rights, privileges, and franchises of the Paducah, Tennessee & Alabama Railroad within the county of Henderson, except the taxes assessed and collected for State purposes, should be paid by the trustee and all other officers collecting revenue for said county to the town of Lexington, or such other person or persons entitled thereto.    In the preamble to this act, as in the preamble of the one already referred to, there is a recital of the efforts of the individual citizens of that town, and of the obligations assumed by them, to induce the extension of this road; and it is stated that this order of the county court was passed in order to encourage and assist these citizens in their effort to bring the railroad to the town, and by the act this order of the county court was in every respect validated.

So, it will be seen that at the very inception these bonds had legislative sanction, and the town of Lexington was clearly recognized as an existing municipality.

The legislature of 1893 (Acts 1893, p. 284, c. 139), in addition to the two acts already referred to, passed a third act, the purpose of which was "to change and extend the corporation of Lexington, Tennessee."    Section 1 of that act provides "that the limits of the corporation of the town of Lexington, Tennessee, shall be changed and extended as follows:    *    *    *;" and section 2 provides that all the territory included within the new limits is thereby "added and made a part of the corporation of said town of Lexington and subject to all the rules,

regulations, and ordinances of the mayor and board of aldermen of said corporation of Lexington."

Again, in 1901, the legislature, by chapter 402, p. 907, of the Acts of that session, once more recognized the town as an existent corporation. Section 1 of that act provides "that the charter of the town of Lexington in Henderson county be and the same is hereby repealed and abolished and that said town have in lieu thereof, the charter hereinafter granted."

Section 4, p. 908, provides that "all the real and personal property and all legal claims, fines, and forfeitures belonging to the said town of Lexington, the charter of which is herein repealed, shall hereafter belong to the town of Lexington hereby created, and that all legal debts, claims and demands now existing against said town of Lexington, the charter of which is herein repealed, be assumed and paid by the town of Lexington hereby incorporated and constitute legal and valid claims against it."

So, it is we have in this case an act of the legislature recognizing the corporation of Lexington, and authorizing it to issue these bonds upon a condition subsequently complied with, and then this last statute, creating a new corporation in place of the old, and charging the latter with all the legal debts of the former, among which are to be included the bonds of the defendant, if, indeed, it were possible for it to create legal liabilities.

These various acts place it beyond question that if the legislature can validate a corporation irregularly or-

ganized, by its recognition of it as such, the town of Lexington was a lawful corporation at the time of the issuance of these bonds.

That it is within the power of the legislature to give force and effect to an act which, but for irregularity, would be valid, provided it could have authorized in advance the act to be done, cannot admit of doubt. *Shields* v. *Clifton Hill Land Co.,* 94 Tenn., 123, 28 S. W., 668, 26 L. R. A., 509, 45 Am. St. Rep., 700; *Butler* v. *Bldg. & Loan Ass'n,* 97 Tenn., 679, 37 S. W., 385; Cooley on Constitutional Limitations (5th Ed.), 457.

It is equally beyond question in this State that there is no check upon the power of the legislature to create a municipal corporation by special act. *State* v. *Wilson,* 12 Lea, 255.

From the principle announced in these cases we think it necessarily follows, as is well said by the counsel for the defendants in this case, "that the legislature might have passed a special act incorporating the town of Lexington, or it might have passed one reciting the attempt to incorporate and the failure to comply with the law in some of its details, and then in express terms waiving the irregularities and declaring the incorporation valid. Such acts would have been unassailable. Those that were passed differ only in this; that they recognized as valid that which they might have declared to be valid."

That implied recognition was as effectual to validate the charter of 1889 as any direct legislation we think is

determined, so far as we can discover, without dissent, by the authorities.

In *Comanche County* v. *Lewis,* 133 U. S., 198, 10 Sup. Ct., 286, 33 L. Ed., 604, the court said: "It is universally affirmed that when a legislature has full power to create corporations its act recognizing as valid a *de facto* corporation, whether private or municipal, operates to cure all defects in steps leading up to the organization, and makes a *de jure* out of what before was only a *de facto* corporation."

The same principle was announced in *Commissioners* v. *Rose,* 140 U. S., 71, 11 Sup. Ct., 710, 35 L. Ed., 344.

*Jameson* v. *People,* 16 Ill., 257, 63 Am. Dec., 304, was a proceeding to test the validity of the incorporation of the town of Oquaka. The defect alleged in that case consisted in taking the vote on incorporation *viva voce,* instead of by ballot. Among the defenses set up was this: That the legislature of the State had twice recognized the existence of the corporation—first by an act entitled "An act to authorize the town of Oquaka to subscribe to the capital stock of certain corporations," and then by a later act bearing the same title. As to the effect of these acts the court said: "The acts of the legislature referred to are public acts, and authorize the president and trustees of the town of Oquaka, as a corporation, to subscribe stock in a certain railroad company, and also to subscribe stock in a certain plank-road company, upon condition, in said acts mentioned, to issue and negotiate bonds of the corporation, to provide for paying interest

Muse v. Lexington.

on such bonds, and to levy and collect taxes upon property within the corporation. These acts recognize the existence of the corporation, and empower it to act as a body corporate issuing and negotiating obligations of the town, upon the faith of which individuals may have invested their money. They preclude inquiry into the question of the original legal organization of the town, and are conclusive upon the question of the existence of the corporation."

Many other cases are to the same effect. Among them are *People* v. *Farnham,* 35 Ill., 562; *Allen* v. *Archer,* 49 Me., 346; *Swain* v. *Comstock,* 18 Wis., 465; *Bow* v. *Allenstown,* 34 N. H., 351, 69 Am. Dec., 489; *Bessey* v. *Unity Plantations,* 65 Me., 347; *City of Atchison* v. *Butcher,* 3 Kan., 104.

The case of *Ruohs* v. *Athens,* 91 Tenn., 20, 18 S. W., 400, 30 Am. St. Rep., 858, is not in conflict with this view, as there had been no legislative recognition of that town as an existing municipality, and its effort at incorporation was a failure because of omissions in certain steps made essential by the legislation under which the town sought to incorporate.

Nor is the case of *Extein Norton* v. *Shelby County,* 118 U. S., 425, 6 Sup. Ct., 1121, 30 L. Ed., 178, authority for complainants. The holding there was that there could be no *de facto* officer when there was no *de jure* office, and that bonds issued by commissioners of a county appointed under an act of the legislature, void because unconstitutional, could not be enforced. This

feature distinguishes that from the present case, for, as has been seen it was clearly within the power of the legislature in the present case to have created the town of Lexington into a corporation, or to have expressly validated what was done by its citizens in an imperfect or irregular manner.

So, we hold that the bonds in question were legal obligations upon the town of Lexington, as authorized under the charter of 1889, and are equally binding upon the new corporation created by the act of 1901.

The result is that the decree of the chancellor is reversed, and the bill of complainants is dismissed, with all costs.